IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA BRANDON WEBB,<br><br>Defendant. | CR 24-138-BLG-SPW<br><br>ORDER |

Defendant Joshua Brandon Webb moved to dismiss the 18 U.S.C. § 922(n) charge against him under *District of Columbia v. Heller*, 554 U.S. 570 (2008), *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and its progeny, arguing that § 922(n) violates his Second Amendment right to possess firearms. (Docs. 19, 20). The Government opposes the motion. (Doc. 27).

The motion is ripe for review and for the following reasons, the Court denies Webb's motion.

I.  **Background**

Defendant Joshua Webb was indicted in Yellowstone County, Montana for possession of dangerous drugs—a state felony. (*Id.* at 2). While on pretrial release, law enforcement found Webb with a firearm on two separate occasions. (*Id.*). First, highway patrol pulled Webb over for a contempt of court warrant and found a

1

firearm on Webb's hip. (*Id.*). Second, law enforcement pulled Webb over and he admitted there was a pistol under the front seat of his car. (*Id.*).

On September 19, 2024, Webb was federally indicted under § 922(n) for receiving a firearm while he was under felony indictment for his case in Yellowstone County. (Docs. 2, 20).

## II. Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits. A pretrial motion is proper when it involves questions of law rather than fact. *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). The Court has determined Webb's motion is appropriate for pretrial resolution because it solely involves a question of law.

Webb challenges § 922(n) as unconstitutional on its face and as applied to the facts of his case. To prevail on a facial challenge, he must demonstrate that "no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This is a "heavy burden." *Id.* Courts facing simultaneous as-applied and facial challenges ordinarily resolve the as-applied challenge before addressing the facial challenge. *Bd. of Trustees of St. Univ. of N.Y v. Fox*, 492 U.S. 469, 485 (1989).

2

## III. Analysis

Section 922(n) states in pertinent part: "[i]t shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year" to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce. 18 U.S.C. § 922(n).

Since the Supreme Court issued its opinion in *Bruen*, this Court has repeatedly upheld § 922(n)'s constitutionality. *See United States v. Stennerson*, CR 22-139-BLG, 2023 WL 2214351 (D. Mont. Feb. 24, 2023), *appeal docketed*, No. 23-1439, (9th Cir. Jul. 14, 2023); *United States v. Evenson*, CR 23-24-BLG, 2023 WL 3947828 (D. Mont. June 12, 2023), *appeal docketed*, No. 24-110 (9th Cir. Jan. 8, 2024); *United States v. Doney*, CR 23-77-BLG, 2023 WL 6442145 (D. Mont. Oct. 3, 2023), *appeal docketed*, No. 24-1034 (9th Cir. Feb. 28, 2024); *United States v. Russell*, CR 24-135-BLG, 2025 WL 42013 (D. Mont. Jan. 7, 2025); *United States v. Lambert*, CR 24-71-BLG, 2025 WL 42007 (D. Mont. Jan. 7, 2025). Nevertheless, because Webb asserts an as applied challenge, the Court will analyze the facts of his case under the *Bruen* framework.

Under the *Bruen* framework, the Court will first analyze whether a violation of § 922(n) violates Webb's Second Amendment right because his regulated conduct (receipt of a firearm) falls within the type of conduct the Second Amendment protects. Then, the Court will analyze whether the Government proved that §

3

922(n)'s prohibition on the receipt of firearms for individuals under felony indictment is consistent with the Nation's historical tradition of firearm regulation.

The Second Amendment guarantees as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court found that the Second Amendment's plain text coupled with an historical analysis of the Nation's gun regulation traditions protects an individual's right to carry a handgun for self defense. *Bruen*, 597 U.S. at 17, 28–29. The Court rejected the means-end scrutiny tests previously applied by appellate courts, holding instead that courts must apply "[t]he test set forth in *Heller*" to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26 (citing *Heller*, 554 U.S. 570).

Like other rights, Second Amendment rights are not unlimited. *Bruen*, 597 U.S. at 21. The "ever-evolving 'history-and-tradition' test outlined in *Bruen* and modified" by the Court's decision in *United States v. Rahimi* "requires a two-step analysis to determine whether a law complies with the Second Amendment." *United States v. Youngblood*, 740 F. Supp. 3d 1062, 1068 (D. Mont. July 1, 2024) (citing 602 U.S 680, 740–43 (2024) (Jackson, J., concurring)).

First, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24.

4

Second, to regulate protected conduct, the government must show that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### A.   *Plain Text*

The threshold question under *Bruen* is whether the Second Amendment applies to Webb and his conduct. Webb decisively contends that his conduct in possessing a firearm is protected under the Second Amendment. (Doc. 20 at 4).

In response, the Government argues that Webb's right to bear arms is properly restricted just as other Constitutional rights are restricted once law enforcement establishes probable cause that a person committed a crime. (Doc. 27 at 6–8). For example, after probable cause is established: (1) a person's Fourth and Fifth Amendment rights are limited because the person may be searched incident to arrest, strip searched if taken to jail, or temporarily jailed prior to judicial adjudication; (2) a person's Sixth Amendment rights may be limited because the person may be denied bail and detained pending trial, potentially precluding them from hiring counsel of their choice; or (3) a person's First Amendment rights may be limited because the person may be prohibited from receiving books and magazines from private parties while detained. (*Id.* at 7 (citing *United States v. Salerno*, 481 U.S. 739, 749 (1987), *United States v. Robinson*, 414 U.S. 218, 224–26 (1973), *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322–53 (2012), *Cnty of Riverside v.*

*McLaughlin*, 500 U.S. 44, 52 (1991), *Kaley v. United States*, 571 U.S. 320 (2014), and *Bell v. Wolfish*, 441 U.S. 540, 549–552 (1949)).

While the Government correctly highlights various aspects of the criminal justice system where a person's Constitutional rights may be curtailed, the Ninth Circuit, since *Bruen*, has cautioned against a blanket prohibition on Second Amendment rights against entire groups of people who have merely been accused of a crime. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1180 (9th Cir. 2024).

The right to keep and bear arms is held by "the people." U.S. Const. amend. II. In *Heller* and *Bruen*, the Court described the Second Amendment right as belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *Bruen*, 597 U.S. at 15. "[T]he Supreme Court has identified a longstanding tradition of prohibiting convicted *felons* from possessing guns," but it has not said anything about the rights of arrestees or pretrial releasees. *Perez-Garcia*, 96 F.4th at 1180 (emphasis in original). Accordingly, the Court will follow Ninth Circuit guidance, and for the purposes of Webb's as applied challenge, find that he is among "the people" within the meaning of the Second Amendment's "bare text." *Id.* ("In our view, to allow the government to exclude an entire group of individuals from 'the people' through mere accusation would be, at minimum, inconsistent with the presumption of innocence." (citing *United States v. Scott*, 450 F.3d 863, 874 (9th

6

Cir. 2006) ("Defendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.")).

### B. Historical Tradition of Firearm Regulation

Because Webb's conduct is protected by the Second Amendment, the Government must "justify [§ 922(n)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 at 17. The historical analysis requires courts to pay close attention to "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 692; *Bruen*, 597 at 29. When engaging in analogical inquiry, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29); *see also Bruen*, 597 U.S. at 30 (requiring the government to "identify a well-established and representative historical *analogue*, not a historical *twin*.") (emphasis in original). Specifically, "the government must prove that the firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 20. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961).

When this Court analyzed § 922(n) in *United States v. Russell*, it took

guidance from *Perez-Garcia*'s review of the Nation's historical regulation of pretrial detainees. The Government requests the Court to turn again to *Perez-Garcia* to determine that a Second Amendment restriction on a person under indictment is relevantly similar to the Nation's historical tradition of pretrial disarmament. (Doc. 27 at 8–11); *see Russell*, 2025 WL 42013, at *5.

In opposition, Webb argues that the statute (18 U.S.C. § 3142(c)(1)(B)(viii)) at issue in *Perez-Garcia* is distinguishable from § 922(n) because the purpose of § 3142(c)(1)(B)(viii) is to assure the safety of the community and requires a judicial determination of perceived danger. (Doc. 20 at 6–7). Webb suggests that *Perez-Garcia* would be inapplicable to his case because § 922(n) requires no such judicial determination and further, Webb was indicted for a nonviolent felony. (*Id.*). Ultimately, Webb contends that § 922(n) is "not analogous to any founding period restriction" and therefore must be unconstitutional because it is inconsistent with the Second Amendment. (*Id.* at 5).

The Court finds the Government's presentation of relevant similar historical tradition as analyzed in *Perez-Garcia* is sufficient for determining the similarity between disarming individuals under felony indictment and the Nation's historical tradition of disarming defendants charged with serious crimes.[1] "[Section 922(n)]

---

[1] "While this Order relies on the parties' historical authority, consideration is also given to Justice Jackson's recent warning about the pitfalls of the *Bruen* methodology. Concurring in *Rahimi*, Justice Jackson cautioned: 'It is not clear what qualifies policymakers or their lawyers

8

is by no means identical to these founding era regimes, but it does not need to be." *Rahimi*, 602 U.S. at 697.

Congress codified § 922(n) as part of the Gun Control Act of 1968. Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220–21 (1968). Relevant to § 922(n), Congress intended to "support Federal, State, and local law enforcement officials in their fight against crime and violence." *Id.* at 1213. It was not Congress' purpose to "place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" appropriate to the purpose of any lawful activity. *Id.* at 1213–14. "The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). "These persons are comprehensively barred by the Act from acquiring firearms by any means." *Id.* Importantly, § 922(n) does not restrict ordinary citizens from the right to bear arms.

In *Perez-Garcia*, the court undertook a Second Amendment analysis by comparing pretrial release conditions under the Bail Reform Act of 1984 (pertinent to § 3142(c)(1)(B)(viii)) to the Nation's historical tradition of regulating individuals

---

(who do not ordinarily have the specialized education, knowledge, or training of professional historians) to engaged in this kind of assessment . . . *Bruen* also conscripts parties and judges into service as amateur historians, casting about for similar historical circumstances.'" *Youngblood*, 740 F. Supp. at 1068 n. 3 (quoting *Rahimi*, 602 U.S. at 745 n.3 (Jackson, J., concurring).

9

awaiting trial facing serious crimes and otherwise dangerous individuals. 96 F.4th at 1181–91. Congress passed the Bail Reform Act in response to "the alarming problem of crimes committed by persons on release." *Salerno*, 481 U.S. at 742. The statute "gives courts authority to make release decisions that recognize 'the danger a person may pose to others if released.'" *Perez-Garcia*, 96 F.4th at 1175 (quoting *Salerno*, 481 U.S. at 742). The government must justify the pretrial condition "by a showing that [the] defendant poses a heightened risk of misbehaving while [released] on bail." *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006). "In sum, the Bail Reform Act offers pretrial detainees freedom pending trial in exchange for abiding by a number of conditions designed to protect the public and secure the attendance of the accused at trial." *Perez-Garcia*, 96 F.4th at 1175.

Webb is correct that unlike § 3142(c)(1)(B)(viii), § 922(n) does not require courts to make a determination of a defendant's perceived danger. However, the judiciary does not need to make that determination when Congress already has. As to persons charged under § 922(n), Congress determined that those who have "been indicted for felonies, may 'have a somewhat greater likelihood than other citizens to misuse firearms.'" *United States v. Munsterman*, 177 F.3d 1139, 1142 (9th Cir. 1999) (finding that § 922(n) is not a bill of a attainder) (citing *United States v. Graves*, 554 F.2d 65, 72 (3d Cir. 1977) (en banc)). Though the perceived danger designation is decided by Congress under the Gun Control Act and by the judiciary

under the Bail Reform Act, the Court finds that in either case, the classification and determination hinges on the protection of public safety. Therefore, just as the court in *Perez-Garcia* looked to the Nation's historical tradition of regulating criminal defendants awaiting trial and facing serious crimes as it compared to the Bail Reform Act, this Court will look to similar historical analogues as it compares to the Gun Control Act, specifically § 922(n).

The Nation has historically restricted criminal defendants from the right to bear arms in order to protect the public's safety. During the founding era: (1) serious crimes were often eligible for capital charges, (2) the government had the power to detain individuals indicted on capital charges, and (3) once detained, the defendants were disarmed.

Since the Founding, the government has been empowered to detain criminal defendants awaiting trial. *Perez-Garcia*, 96 F.4th at 1182 (citing U.S. Const. amend. V (providing that a person may be "held to answer for a capital, or otherwise infamous crime . . . on a presentment or indictment of a Grand Jury"); Act of Sept. 24, 1789, ch XX § 33, 1 Stat. 73, 91 ("[F]or any crime or offence against the United States, the offender may . . . be arrested, and imprisoned.").

Detaining criminal defendants was far more common than pretrial release, especially for defendants who committed a "capital crime." "[C]apital crimes" encompassed a broad set of offenses including felonies and even some nonviolent

11

crimes such as forgery and horse theft. *See Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing the escape attempts of men condemned to die for forgery and horse theft in Georgia between 1790 and 1805)). The First Congress also imposed capital punishment for crimes such as "forgery of United States securities" and "running away with a ship or vessel, or any goods or merchandise to the value of fifty dollars." *Harmelin v. Michigan*, 501 U.S. 957, 980-81 (1991) (opinion of Scalia, J.) (quoting An Act for the Punishment of Certain Crimes Against the United States, Chap. IX, § 8, 1 Stat. 112, 114 (1790)) (cleaned up).

Typically, if a defendant was detained, then they were disarmed. *See State v. Buzzard*, 4 Ark. 18, 21 (1842) (opinion of Ringo, C.J.). ("Persons accused of a crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned.").

At the Founding, detainment was far more common than pretrial release. For example, during the first Congress, bail became available in all criminal cases "except where the punishment may be death." *See* Act of Sep. 24 1789, ch. XX, § 33, 1 Stat. 73, 91. Similarly, state constitutions "provided an affirmative right to pretrial release except for those accused of 'capital' crimes." *Perez-Garcia*, 96 F.4th at 1183 (citing Pa. Const. ch. ii, § 28 (1776) ("All prisoners shall be bailable by sufficient sureties, unless for capital offences, when proof is evident, or presumption

great."); N.C. Const. Art. XXXIX (1776); Vt. Const. ch. II, § 25 (1777); An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio (1787) § 14, art. 2, 2 *Laws of the United States of America* 559, 564 (1797); *cf.* 4 William Blackstone, *Commentaries* *294 ("[I]n felonies, and other offences of a capital nature, no bail can be a security equivalent to the actual custody of the person.")).

Nevertheless, persons who committed "capital crimes" were generally detained and subsequently disarmed. *See Perez-Garcia*, 96 F.4th at 1183. (the "historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial.").

Here, the historical tradition of pretrial disarmament for a serious crime poses a "comparable burden" on a defendant's Second Amendment rights as the Gun Control Act's firearm restriction on Webb. *Id.* at 29. Both restrictions allow for complete, but temporary disarmament of defendants facing serious charges. Likewise, the modern and historical regulations are "comparably justified." *Id.* Like the Gun Control Act, "the historical regulations for pretrial detention and disarmament have long included protecting the public from future criminal acts of the accused defendant." *Compare* A. Highmore, *A Digest of the Doctrine of Bail: In Civil and Criminal Cases*, vii (1783) (explaining that pretrial detention in the late 18th century ensured that "the safety of the people should be preserved against the

lawless depredations of atrocious offenders"), *with Barrett*, 423 U.S. at 218 ("The very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."). Thus, the temporary disarmament under § 922(n) is justified by the Nation's historical evidence of regulating individuals awaiting trial and facing serious offenses.

Accordingly, the Court concludes that the Gun Control Act's restriction on firearm use for a person under indictment for a felony charge is "relevantly similar" to the founding era tradition of disarming criminal defendants facing serious offenses. *Bruen*, 597 U.S. at 27.

C. *As Applied to Webb*

Like capital offenses at the Founding, which included non-violent offenses, felonies constitute serious offenses. Webb is indicted under a state felony charge and therefore is facing a serious offense.

Additionally, like founding era defendants who faced detention and disarmament in the interest of public safety, Congress has similarly determined that a person under a felony indictment 'ha[s] a somewhat greater likelihood than other citizens to misuse firearms'" and thus, restricted their rights to firearms. *See Munsterman*, 177 F.3d at 1142, *Barrett*, 423 U.S. at 218. Though Webb was not detained under his state felony indictment, he nevertheless faces a serious felony

offense, and the historical regulation of defendants facing serious offenses "imposes a comparable burden" of temporary disarmament. *See Bruen*, 597 U.S. at 30 (requiring "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

Accordingly, the Court holds that the Gun Control Act's firearm restriction on a person under a felony indictment (18 U.S.C. § 922(n)) is constitutional as applied to Webb. Because § 922(n) is constitutional as applied to Webb, his facial challenge is foreclosed. *See Salerno*, 481 U.S. at 745 ((holding that to prevail on a facial challenge, a movant must demonstrate that "no set of circumstances exists under which the [statute] would be valid."). For these reasons, Webb's motion to dismiss is denied.

## IV. Conclusion

IT IS ORDERED that Defendant Joshua Brandon Webb's Motion to Dismiss (Doc. 19) is DENIED.

DATED this 14th day of April, 2025.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge